The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. You may be seated. Mr. Weiss, when you're ready. Good morning. My name is Brad Weiss. I represent the appellant in this case. And if I could take 35 seconds to give you just a little bit of history of the individuals involved before I go into some of the issues, I think it might be helpful. Priority Auto Group is owned by a gentleman named Mr. Dennis Elmer. Mr. Elmer grew up in the area of Norfolk and Chesapeake and always wanted to be in the car business and eventually moved to Tysons, worked in the car business, and always wanted to come back here. He had an opportunity to purchase a franchise and from that developed a very large automotive group that was successful personally, financially, and in serving the community in the area. He gives back to the community. Mr. Council, on the other hand, was an individual whose family had owned a Ford dealership for about 50 years. And Mr. Elmer had always gone by that Ford dealership in his youth and always wanted to be a Ford dealer. He had represented many other franchises. He had earned more wealth than he probably knew what he could do with, but he wanted to be a Ford dealer. And for many years, he would go visit Mr. Council at Kimnock Ford and say, if you ever decided to sell, I want to buy that. All of this information is in the transcripts of the deposition of Mr. Council and Mr. Elmer. And one day, Mr. Council said, I'm ready, but I want to work with you. I want to be a part of the priority group that comes from his deposition transcript. And so a deal was struck in which Mr. Elmer, through one of his companies, would purchase the real estate as well as the stock, and Mr. Council would remain a 10 percent equity owner receiving distributions every year and had the right to assign it to his son if he chose to do so when he retired or passed away. Mr. Elmer was so excited that before the deal was completed, he contacted Ford Motor Company because he knew many of the people at Ford. They had worked at Toyota and other places. You'll see in the appendix, 416 is an email from Mr. Elmer on July 6th of 2010 saying, guys, essentially, and gals, I'm going to do this Ford dealership, and I look forward to being a great Ford dealership. And as he testified in his deposition, was prepared to put in a new building, spending approximately $10 million for Ford. The very next day, there's an internal email from the corporate designate, which his name is O'Connor. I think she got married and changed her name, dated July 7th. That's at the appendix 415 of 416. And if you read it, along with the other documents that were found in this case, it's an aha moment. We can implement our plan, get rid of Kim Nock. We're not telling Mr. Elmer what we're doing. We're going to exercise the first right of refusal, take this over, transfer it to a company that has no assets, and divide it up amongst the competitors in the market. What's also most telling as we go through this story, you'll see at appendix 536, a diagram. It is a market representation report done by Ford in 2009. And in that report, Kim Nock is showing the second best sales of cars, trucks, and fleet vehicles in the second highest profit in the market area. So by September of 2010, Mr. Elmer has entered into an asset purchase agreement. Back on July 8th, he sends in an application, which is at the appendix 419 of 424. And on 424, you'll see a little note. I look forward to being a Ford dealer. That was his life dream. That was the deal he worked out. So now we come to the statute. We have 46.2-1569-33A, in which under 3A, I call it three and a half. There are three and a half reasons in which a manufacturer under the statute is entitled to decline a dealer applicant who by statute is granted standing. It says it right in the statute expressly. Not inferred, not something you have to look at. It says it right there. And the three grounds for rejecting an applicant are, I believe it was your financial status, your moral character, and maybe your customer standing, something along those lines. The half, Your Honors, and I guess the crux of part of the issue in this case, is at the end of 46.2-1569, subsection 3A, it says, notwithstanding the foregoing, a manufacturer may exercise their first right of refusal in accordance with 1569.1. And so I think at this point, this is in part where I think the magistrate in his report and recommendation, I think, missed something. So I see this as two trains going down a track with mixed metaphors, two bundles of rights. On the one hand, Mr. Counsel has certain rights as the selling dealer under the contract and under the statute. Mr. Elmer, priority, has a second set of rights. Some of those are common law and some of those are statute. So Ford was obligated either to reject or refuse him. Testimony, if you ask me for a citation, I'll give it to you. Absolutely great reputation. They wrote him a letter. They wrote emails. He was a great candidate. So that wasn't an issue. They didn't refuse him for one, two, or three. Their contention in a letter was, we're rejecting you not because of that, but because we're exercising a first right of refusal. And their position is... No, no, no, no. It's not really we're rejecting you because we're doing that. No. Notwithstanding reasons for rejection, not having none, as you said, we are now exercising the option. You said we're rejecting you because we're doing it. But it's not rejecting. Ford has taken the option, which the statute says, notwithstanding not having those reasons for objection. You agree that they can exercise the option, correct? I have the actual letter they wrote, if you want me to put it. No, but I'm talking about the statute. That's not rejection of the statute. That's taking an option. That's why I characterized the judge as three and a half. So the three are... Your half is not consistent with the statute. As you said, notwithstanding those three grounds, this is another option, but it's not a rejection. I don't disagree with you. It's not a rejection in that form under 1, 2, and 3 under 3A. It is an alternative. That's why I call it a half. However, and even counsel admits this in their brief, their opposition brief, page 21, paragraph, first paragraph, line number 6, that in exercising the first right of refusal, it must be found valid. And so here's where I think the intersection of these issues sort of intervenes, so to speak. And counsel's position and the court's position was that we had no standing. Now, under 46.2, 1569, 3, and 3A, we clearly had standing to bring a claim. And the issue then becomes, did they properly exercise a right of first refusal? So in this case, we have contended. And what is, I think, very interesting is the allegations in our lawsuit pair up exactly with the facts and evidence proved. Now, you may not agree with me at the end of the day, but they pair up exactly, and our briefing down at the district court followed almost exactly the analysis in the Dunlap case when they're talking in the dicta about the tortious interference claim. And in this case, we are contending and have contended that they used improper means or methods, as most recently defined in the Dunlap case, which is either unethical or unfair treatment or undue influence. And what do we have that suggests that kind of behavior from the record? Not just an allegation from the lawsuit, but from the record. April 20th. I do not, and I'm not asserting any claims on behalf of Mr. Counsel. The rights, that's why I said to you there are two tracks or two bundles of rights, if you want me to mix the metaphors, is that Mr. Counsel had his own rights, but by common law as well as the statute, the dealer did as well. Because if they didn't properly exercise the first right of refusal, which I contend they did not, and the evidence I think suggests it, then 1569.1 is a measuring tool for our claims. Let me explain to you why. The fourth paragraph in 1569.1 specifically says the applicant who is not successful gets attorney's fees. That's one piece of the puzzle. Then we go back and look at the consideration in the first paragraph. Pardon me? That count, which was count four, was resolved between the parties. Yes, sir. That has been done. If you look at the first paragraph. If you've been paid what the statute provides, what's left for you? Our common law claim of tortious interference, which has not been resolved, and that is that they never had an intent. In a first right of refusal, in looking at Virginia case law on it, you step into the shoes. If I have a contract, you step into my shoes and you execute on it. That is not what they did. What they did was set up a scenario where they intended to assign it to their assignee to break up the dealership, close the point, and sell off the assets to competitors. How did they do it? They wrote a letter on April 21, 2011, their assignee, with a draft lawsuit, seeking an injunction against my client and a claim against Mr. Counsel, appendix 281 to 299. What else did they do? The attorney for DAC wrote an email, appendix 304, making threats. They were not acting in good faith and in fair dealing. And what did Ms. O'Connor say in her deposition when I grilled her? She could not recall if she ever threatened my client, but when I asked her, do you deny it? Meaning, do you deny that you've told him if you raise a fuss, you're not going to get a franchise now or in the future? They all go to the execution of that first right of refusal because the asset purchase agreement that was a part of this transaction was completely, totally changed by the end of the day with Mr. Counsel. And indeed, they required him to enter into a settlement release agreement. How does that relate to me, my client? Well, if you step into my shoes, then you must execute on that transaction the same. The statute makes one adjustment. Mr. Weiss, may I ask you a question? Yes, sir. Do you think Ford could say, hypothetically, not these facts, perhaps, not say, all right, we're not rejecting as they did. We are rejecting the applicant, but we are exercising our option to purchase for the sole purpose of shutting this dealership down. Would you have a claim then? That's all they did. No nefarious letters, nothing that you said. Just said, all right, we're exercising our option because we're going to shut this dealership down. They have a statutory problem. What is the problem? 1569 subsection 5 is the procedure for properly terminating a dealer. And that's within their franchise agreement, correct? They have a right to terminate a deal within their franchise agreement. In the context of the agreement between the franchisee and the franchisee. Yeah, if they wanted to terminate the dealer and we were not a party to a contract, I'd have no rights whatsoever. No, no, I'm giving you my scenario. You've done everything, Mr. Elman's done everything he did, which is, you know, as you said, it was his boyhood dream to own it, all those things, all those things. The only difference is Ford didn't mince around at all. They said, our option, because we want to shut it down, period. Then they proceed, consistent with their agreement, franchise agreement, to do that. Would you have a claim? Under the statute, I think the answer would be yes. What would be your claim? Tortious interference. Interference with what? We had a contract with Mr. Counsel, a binding contract, which in part required a 10% equity interest. You knew that would be subject to the agreement that the dealer had with the franchisee. They could certainly turn us down. I mean, they would have that right, and that goes to an affirmative defense under restatement 769. They did. They turned you down by exercising the option to purchase the dealership. They did that, and they said our objective is just to shut it down. That's my question. What would be the tortious interference there in the confines of their agreement, aren't they? Sure. We had a contract, an asset purchase agreement that contemplated Mr. Counsel, for important reasons, would remain a shareholder in an ongoing dealership. Okay. And in lieu of terminating the dealer or the franchise agreement in accordance with 1569 subsection 5, if Ford chose to close the dealership down, I think that would be a problem. If they chose to sign it to someone else properly and run it as a dealership and give the 10% equity, then we wouldn't have a claim in that regard. We sit as a court. We don't sit as an ombudsman for business deals and whether or not they're good or bad. We try to construe the law, as you say, common law perhaps. But what would be the gravamen of your common law tortious interference or restatement of torts? What would it be? If there were no improper means or methods asserted, you'd have to have an improper motive. We haven't asserted an improper motive. So do you concede that shutting the dealership down is not an improper motive? I have no idea if it's an improper motive because I'm not focused on improper motive. I'm focused on improper means and methods. You have to be focused because that's my hypothetical. That's my question. Would that constitute appropriate? Yeah. Would that be an appropriate motive? Would it? I'm not sure I know the answer to that. That's a very important question, I think, for you, I think. All right. Your time is up unless my colleagues have questions. I'll think about it on the reply, if I may. Mr. Weiss, let me ask you just one thing before you sit down. You've been going back and forth between asserting a statutory claim and a common law claim. Are you saying that you have both claims still standing? Well, they're not standing because they were dismissed, but I assert that, yes. But both claims still before us in this appeal? Yes. Okay, because I had understood your answer perhaps to Judge Agee's question, that once you were paid your fees that you were relying on tortious interference with contract, which would be a common law claim. Yes. And so I just wanted to clarify, you're still asserting your statutory claim as well? Yes. I don't think getting paid relieves them of the obligations completely under the statute. Okay. I just wanted to make sure that you were still on track for both. Sure. Thank you. Thank you, Mr. Weiss. Mr. Perrella? May it please the Court, Dominic Perrella on behalf of Ford Motor Company. Let me begin, Judge Gregory, where you left off, which was to ask opposing counsel, let's say Ford exercises a right of first refusal, buys the dealership, and then wants to shut the dealership down. Is there anything wrong with that? The answer to that is absolutely not. Ford has a statutory and contractual right, of course, to buy the dealership. That's the whole purpose of the right of first refusal. The Virginia statute recognizes as much. And once Ford or its designee owns the dealership, they of course have the perfect right, it's their business, to shut it down if they're so inclined. So the flavor that runs through my opponent's brief, that somehow there's something nefarious about Ford buying this dealership or its designee buying this dealership, simply has no basis in law. So let me start, if I might, with the statutory claim. Well, this case was decided on the pleadings anyway, wasn't it? That's right. But even at the pleading stage... You didn't even get into the extended factual background. Judge Keenan, I completely agree that not only do you not need to, but in fact I don't think it's available to the Court. This Court said in thinly lines that when a case is decided on the pleadings, even when materials outside the pleadings are attached to the pleadings, which in this case, and even materials not referenced in the pleadings, when the District Court doesn't use those, doesn't rely on them or look at them in deciding a 12C motion, you decide it on a normal 12C, 12B6 standard. And that's this case. So let me turn, if I might, to the statutory claim first. Judge Agee, I think you asked my opponent, if they paid you your expenses, which is what sub 4 of 1569.1 requires, what's left of this case for you? And he did say, although he tried to retract the concession to Judge Keenan, he did say, just my common law claim. And I think that's right. Because once Ford invokes its right of first refusal, we're inside 1569.1. And 1569.1 sets forth particular remedies if Ford does not properly follow through on all its promises and the right of first refusal. And those remedies are, number one, if Ford doesn't pay the dealership everything that it would have gotten under the APA, the dealership, of course, could sue Ford and say, pay me what I'm owed. The dealership here didn't do that. The dealership is not in this court. They're not a party. They never sued. The second remedy is that Ford must pay, they must agree to pay, and then pay the would-be buyer its expenses. And there's no dispute in this case that that occurred. And so I don't see what's left of the statutory claim from my opponent. Let's look at that a little bit. Sure. The statutory claim. Let's say the three grounds for rejection, as is undisputed here, are not met and not an issue. But in furthering the idea of protecting people in the shoes of the proposed purchaser, wouldn't it be a problem if you did an end run? Because it said, notwithstanding not having those three reasons, you could have the option. But the statute sets forth that you have to match, don't you? So if you could just do anything and suppose, for example, it's not just the end, for example, and if you said, well, listen, I really don't want Mr. Elmer to buy this thing. I'm going to give you half of what he's giving you, and I want you to take it. And if you want to deal with four from now on, you should take this deal. Do you think that they would be statutorily out of the mix just because you had the option and you did something like that? I think that's Mr. Weiss when he refers to nefarious. Do you think they would have no statutory rights to say, no, in fact, you have did an end round on them and have not exercised that notwithstanding provision of the statute properly? So the answer to that is that there is someone who would be able to bring a claim in that circumstance, and that someone is Kim Nock, the dealer. The statute says they have the absolute right, once Ford invokes the right of first refusal, to get paid the same or greater than they would have gotten under the APA. And since they're getting out of the business anyway, right, they're either going to sell to the buyer or they're going to sell to Ford. I can't imagine why they would not, in that case, enforce their rights and say, pay me what I'm owed. And, of course, in that case, you don't need to look at any of this, but factually speaking, that's exactly what happened. Ford said, here's what I think your deal is worth. They came back and said, no, no, it's worth much more than that. And after extended negotiations and back and forth threats of litigation, they agreed on a number. I guess the problem would be if Selma may have a right of action, perhaps, but it would be cured by just paying counsel the rest of the money that's owed. Even that would be the end of that. And that actually, Judge Greger, I think, really gets to the heart of this because what we have here is a situation where if anyone is owed anything, and it's our position that Ford paid Mr. Counsel exactly what he deserved, and Mr. Counsel, of course, accepted the deal. But if anyone is owed anything, Mr. Counsel would be owed something. And yet, here we have priority in court saying, let's assume for a second, I'll make up a fact, let's assume that at the end of the day, if all the facts here got adjudicated and some jury decided, hey, Ford should have paid Mr. Counsel $500,000 more than he got. Now, we don't think that's so, but let's say they did. Why would it be in that situation that priority could come in and ask for $15 million? That doesn't make any sense to me. And I think if I could propose an alternative factual situation for the court just to illustrate how this statutory claim doesn't make sense. Let's assume that Ford exercised the right of first refusal, and everyone agrees that they paid Mr. Counsel everything that he deserved, same or greater consideration. And let's assume that Ford said to priority, sure, we'll pay you your expenses as the statute requires. And let's say that Ford said, your expenses were $100,000, here's your $100,000. And priority said, no, we're owed $101,000. Under that scenario, under my opponent's theory of the statute, that would be an improper exercise of the right of first refusal, and priority could sue not for $1,000 under 1569.1, but $15 million under 1569.3a. That just doesn't make sense. The statute provides the remedies to which they're entitled, and the remedy is their expenses. If I might turn to the tortious interference claim, my opponent concedes that improper methods need to be shown here. They conceded it both today at argument and in their brief. And the fact of the matter is they simply cannot show improper methods because on the face of their complaint, they say, Ford had a statutory right and a contractual right to exercise the right of first refusal. As soon as Ford exercised that right of first refusal, priority's ability to close on this deal on the APA was cut off, and the only thing that they were owed was their expenses. And so this court, the Virginia Supreme Court said in the Lewis-Gale case, tortious interference does not lie when the party that's allegedly interfering has a statutory or contractual right to do so. I would submit to you that that's this case. This court can resolve this case on the improper methods ground alone. And just to tie it off, let me also mention, the Virginia Supreme Court and other state Supreme Courts across the country, Lewis-Gale, the Tynan case we cite, have also said that when a statute, when the General Assembly affirmatively in a statute says what a party is owed in a certain circumstance, you don't then come in and put in common law claims that would contradict that statute. And here the Virginia General Assembly said in 1569.1, when Ford exercises a right of first refusal, that's entirely valid, and what the dealer is fully protected, they have to get what they would have gotten, but what the would-be buyer is owed is their expenses. And so to come in and say we're going to impose a common law claim on top of that that contradicts that remedy and that allows them to seek unlimited expectancy damages, I think, in addition to the improper methods ground, is an approach that is foreclosed by the statutory scheme. If the court has no questions, I'll submit. Thank you. Thank you. Mr. Weiss, you have some time, sir. I don't know if I can be really succinct on this. You had asked me a hypothetical earlier. If they did it properly, not in the facts and circumstances case, one could properly exercise a right of first refusal. You had also asked me about the rejection letter. And the last three words are you're hereby terminated or rejected. So, in fact, they did reject them. They just rejected them on the grounds of the first right of refusal. So let me go to someplace counsel. Because I think the Dunlap case opens up the factual issue as to whether or not it was a valid exercise of first right of refusal, whether they have an affirmative defense under 769 to go forward with a torsion interference claim. So everything that counsel just told you about use of the term valid, if you look at his brief, page 21, first full paragraph, line number 6, he's referring to whether or not you have a claim and found valid, referring to the first right of refusal. So part of the analysis is was, under these circumstances, the exercise of the first right of refusal valid and appropriate? I think that's a factual dispute. I think the defense of they had a privilege or a financial right is a fact issue. Judge Keenan, you asked before. You may be right in that regard that part of it is a legal analysis and part of it is fact. But if you don't properly exercise the first right of refusal, if I have an agreement for us to sell a house and Judge Gregory has a first right of refusal and he comes in and says he's stepping into the shoes of me to buy your house and then does something different than what was agreed upon, I don't think you have a valid exercise of first right of refusal. And the point that counsel didn't emphasize is that in this transaction, it was proposed a 10 percent equity interest in an operating dealership. So the statute of 1569.1, I'm not asserting this for Mr. Counsel. I'm using it as part of our claim. The consideration, what you bargained for, must be the same or greater. This is an issue as it relates to us, not as it relates to Mr. Counsel, because we had a contract where it was important for Mr. Counsel to remain an equity interest holder. Everything that counsel was telling you for the last four minutes, he talked about a valid exercise. So let me change it for a moment with my own hypothetical. Suppose Ford doesn't like short people like me and decides that every applicant that's short like me, they will exercise a first right of refusal and do something different with the dealership. This is a common law argument on this one. Could they do it? Being short isn't necessarily a protected category, but you could use a number of examples with protected categories whereby when they do that exercise, it wouldn't be valid. So yes, when they step into the shoes of priority in the transaction, they're expected to exercise that first right of refusal. What did they do here? They did everything but that. They hammered at my client, they hammered at Mr. Counsel, and they got a different deal. All the money, if you look at the internal documents, all the money was coming from Ford. They were behind this entire transaction of what they wanted to do. And I'm suggesting to you and I'm arguing to you, you had asked me before, there were four counts in the case. Count number four was a separate count from counts one, two, and three, and count four was over fees. They settled that matter at the district court level. That doesn't obviate the other claims, of course, unless you decide that it does. But I think the issue of standing in this case, both under the statute and the way that the case proceeded, it was a 12B, I think it was 12B1 on the standing, but yet we had a hearing on it, we had discovery, and then they came back with a summary judgment, and then the magistrate judge, I think it was Leonard, wrote a recommendation report in which he adjudicated it on the standing issue, even though they brought documents from outside the pleadings as part of their case, and we had all this evidence that was found in the case. And what's unusual, and I ask you when you consider it, what's unusual about this case, the facts and allegations in the complaint match up with the facts and evidence. You may disagree with me ultimately on this issue, but if you look at the facts and evidence, Ford did exactly what we did. And if they're entitled to do that, then they can step into every transaction for good, bad, or nefarious reasons, exercise a first right of refusal, and get away with it. I'm out of time. Thank you. Thank you so much for your argument. We'll come down to Greek Council and proceed to our next case.
judges: Roger L. Gregory, G. Steven Agee, Barbara Milano Keenan